**SACK & SACK, ESQS.**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

**HARRY RUSSELL FRAZIER,**

                             Plaintiff,

— against —

**TIFFANY & CO., and DAVID WILSON,**
individually,

                             Defendants.

-----------------------------------------------------------x

'07 CIV 9366

Index No. _____ (___)

ECF CASE

**COMPLAINT**

**JURY TRIAL REQUESTED**

OCT 19 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Harry Russell Frazier ("*Frazier*" or "*Plaintiff*") by his attorneys, Sack & Sack, Esqs., file the following Complaint against his former employer Defendant Tiffany & Co. ("*Tiffany*") and immediate supervisor and David Wilson ("*Wilson*," together with Tiffany, "*Defendants*").

       Frazier, as and for his complaint, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff complains that his former employer, Tiffany, together with its agents and representatives, engaged in the unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, ("*Title VII*") based upon his race, African American.

2.      Plaintiff further complains that Defendants engaged in the unlawful discrimination and retaliation of Plaintiff in the terms, conditions, and privileges of his employment in violation of New York State New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon his race, African American.

3.      Plaintiff further complains that Defendants engaged in unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment in violation of 29 U.S.C. § 2601 et seq. based upon his exercising of or attempt to exercise his lawful right to take family medical leave to care for his Autistic son pursuant to the Family and Medical Leave Act of 1993 ("*FMLA*").

4.      Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendants.

5.      Plaintiff further complains that he has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendants:

      a.      Discriminated against him with respect to the terms, conditions and privileges of his employment on account of his race, African

American, by providing a fabricated poor performance review without warning or justification;

b.    Discriminated against him with respect to the terms, conditions and privileges of his employment on the basis of his exercising of or attempting to exercise his lawful right to take family medical leave to care for his autistic son pursuant to the FMLA, by providing a fabricated poor performance review without warning or justification; and

c.    Deprived Plaintiff of his employment rights in violation of federal and state law.

6.    On or about April 9, 2007, Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 520-2007-02289.

7.    Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the EEOC on July 24, 2007.  (Exhibit "A")

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

9.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

3

1391(a). Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred during the course of his employment at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

10. Plaintiff served copies of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel prior to filing it in the United States District Court.

## PARTIES

11. Plaintiff is an individual who, at all times relevant 109-35 111th Street, 2nd floor, Richmond Hill, New York, in the County of Queens.

12. From October 22, 1990 until his unlawful and retaliatory termination on June 15, 2006, Plaintiff was employed by Tiffany.

13. At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, et seq., § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and thus, afforded protection against sexual harassment and discrimination and retaliation in employment on the basis of his race, African American.

14. At all times relevant to this Complaint, Defendant is a corporation licensed to do business in the State of New York, with offices located at 600 Madison Avenue, New York, New York, County of New York.

15. At all times relevant herein, Defendant is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

4

16.    At all times relevant hereto, Tiffany is an employer within the meaning of the FMLA and as such is prohibited from discriminating against Plaintiff on the basis of his exercising of or attempting to exercise his lawful right to take family medical leave to care for his autistic son pursuant to the FMLA.

17.    Defendant David Wilson is an individual who is currently employed by Tiffany at 600 Madison Avenue, New York, New York.

18.    At all relevant times herein, Defendant Wilson was Plaintiff's supervisor and in a position to discriminate and retaliate against Plaintiff in violation of NYSHRL and NYCHRL.

19.    At all relevant times herein, Defendant Wilson is an individual who either aids, abets, incites, compels or coerces unlawful discriminatory retaliation pursuant to NYSHRL and NYCHRL.

20.    At all relevant times herein, Defendant Wilson was Plaintiff's supervisor and in a position to retaliate against Plaintiff in violation of NYSHRL and NYCHRL.

21.    At all relevant times herein, Defendant Wilson is an individual who either aids, abets, incites, compels or coerces unlawful discriminatory retaliation pursuant to NYSHRL and NYCHRL.

## FACTS

The claims set forth herein arise from the following set of facts:

22.    Plaintiff was employed at Tiffany for nearly 16 years, from October 22, 1990 until his unlawful and retaliatory termination on or about June 15, 2006.

23.    During most of his employment at Tiffany, Plaintiff was employed as an engraver.

24.    Throughout his tenure as an engraver, Plaintiff was the only African American engraver employed by Tiffany out of approximately 21 engravers.

25.    Throughout his employment at Tiffany, Plaintiff suffered harassment and discrimination based upon his race, African American.

26.    Plaintiff complained of discrimination throughout his employment with Tiffany.

27.    The discriminatory actions of Tiffany included, but was not limited to, treating Plaintiff differently in respect of the terms, conditions and privileges of his employment by, among other things, reprimanding and disciplining Plaintiff for exercising of or attempting to exercise his lawful right to take family medical leave to care for his autistic son pursuant to the FMLA, as compared with similarly situated Caucasian peers, who were not disciplined in the same manner for tending to their own personal medical issues or who were inexcusably late or absent from work.

6

## PLAINTIFF'S EMPLOYMENT HISTORY

28.    Plaintiff commenced his employment with Tiffany on October 22, 1990 where he was hired in the position of Packer.

29.    In 1991, Plaintiff was transferred to the mailroom, where he worked for the next two years until 1993.

30.    In or about April 1992, in celebration of Secretary's Day, Plaintiff voluntarily drew several murals and handed them out to all of the executive secretaries as gifts in appreciation for all of their hard work and assistance.

31.    At that time, Ms. Rita Eckert, who was an Executive Secretary, noticed Plaintiff's artistic talents and showed his work to Norman DiSalvo, who was then director of the Hand Engraving Department at Tiffany.

32.    On or about April 13, 1993, following a meeting with Mr. DiSalvo, Plaintiff was promoted to an apprentice Hand Engraver in Tiffany's Engraving Department.

33.    During that time, Plaintiff was taught the trade of hand engraving by Mr. DiSalvo himself, along with his assistant manager, Mr. Elwood Werner.

34.    From April 1993 through October 1994, Plaintiff served as an apprentice hand engraver, where he sketched letters, drew logos on paper, and on the merchandise which in turn was saving time for the other engravers who only had to engrave instead of draw on the merchandise themselves.

35.    Beginning from the time Plaintiff was hired as an apprentice Hand Engraver through his unlawful termination from Respondent, Plaintiff suffered racial discrimination that was brought forth in the form of discriminatory, humiliating, unwelcome, crude, and inappropriate behavior, jokes, innuendo and abuse, for which there is no legitimate business justification.

<div align="center">

**PLAINTIFF SUFFERS DISCRIMINATION**

</div>

<div align="center">

<u>**EXAMPLES OF EARLY INCIDENCES OF ABUSE**</u>

</div>

36.    From 1993, shortly after Plaintiff was transferred to the hand engraving department at Tiffany, through Plaintiff's unlawful termination on or about June 15, 2006, Tiffany and its agents took affirmative steps to discriminate Plaintiff and treat him differently than his Caucasian coworkers in respect of the terms, privileges and conditions of his employment, despite his hard-work, seniority, experience and acumen.   This behavior exacerbated in the latter years of Plaintiff's employment with no legitimate business justification.

37.    For example, as an apprentice in the Summer 1993, during one of the teaching sessions conducted by then assistant manager, Mr. Werner, Plaintiff had run out of cotton, which was necessary to complete a particular class assignment.

38.    When Plaintiff asked Mr. Werner for additional cotton balls, Mr. Werner indignantly walked to the supply cabinet to bring Plaintiff additional cotton balls.

39.    Mr. Werner then stood in front of Plaintiff's desk and sprinkled the cotton balls on the floor.  When Plaintiff looked up at him in surprise and bewilderment, Mr. Werner smiled

<div align="center">8</div>

broadly and told Plaintiff, **"You should be familiar with picking these [cotton balls] up!"**

40.    Following this incident, Plaintiff felt humiliated and embarrassed.

41.    Despite Mr. Werner's discrimination and harassment, Plaintiff continued to work because of serious fear of losing his job.

42.    Mr. Werner continued to harass Plaintiff over the next several days.

43.    Plaintiff then complained Mr. DiSalvo about Mr. Werner's continuous mistreatment.

44.    Mr. DiSalvo later called Plaintiff into his office and had Mr. Werner shake his hand and apologize, but it clearly was not genuine.

45.    Because Plaintiff was still an apprentice and in fear of losing his job, Plaintiff continued to work knowing that he was being treated differently than his similarly situated Caucasian coworkers because Plaintiff was African American.

46.    In or about 1996, Maryellen Fink was hired as the manager in the Engraving Department.

47.    Oftentimes, for no apparent reason, Ms. Fink would criticize Plaintiff's engraving talents and single him out because of his race, African American.  Ms. Fink also verbally threatened to terminate Plaintiff' employment several times in front of other employees.

48.    Despite Ms. Fink's criticisms of his poor talents as a hand engraver, Plaintiff continued to perform as a hand engraver for ten (10) years following her obvious pretextual threats.

49.    Plaintiff complained several times to the master engravers, Simeon Papadopoulos and Peter Ciavarella, about Ms. Fink's discriminatory harassment, but to no avail.

50.    Despite his circumstances, Plaintiff was told to "just do his job" and there was nothing he could do about the discriminatory treatment he was suffering.

51.    On or about April 29, 1998, Plaintiff reported Ms. Fink's discriminatory harassment to Ms. Bulfair of human resources, who told Plaintiff that he should listen to Ms. Fink and deal with her criticism.

52.    In August 1998, as Ms. Fink's harassment continued to an intolerable point, Plaintiff contacted Jonathan Sack, Esq. of the law firm of Sack & Sack to assist him with the racial discrimination Plaintiff was undergoing.

53.    Following Mr. Sack's letters, Tiffany responded that Ms. Fink was counseling Plaintiff in an attempt to improve his job performance and that his job was not at risk.

54.    In Winter 1999, shortly after Mr. Sack's letters were received by Tiffany, Ms. Fink was terminated.

55.    A few months following Ms. Fink's termination, Roseanne Perri, who was the quality assurance inspector in Tiffany's engraving department, confided in Plaintiff that Ms. Fink was out to fire him for no apparent reason. Ms. Perri went on to apologize to Plaintiff for having to go along with Ms. Fink's constant, discriminatory abuse.

> **PLAINTIFF'S SON IS BORN AND DIAGNOSED
> WITH SEVERE AUTISM**

56.     On August 7, 2000, Plaintiff's son, Tyler Neven Frazier, was born.

57.     Until age 2, Tyler seemed to be a normal child until Plaintiff and his wife noticed that he was not engaging in age appropriate (age 2) activities.

58.     When Plaintiff and his wife had Tyler tested, the doctors diagnosed Tyler with PDD/Autism.

59.     PDD or pervasive developmental disorder is a behavioral disorder of speech, communication, social interaction, and repetitive type compulsive behavior. Autism is a form of PDD. The most commonly encountered PDD is childhood autism.

60.     Children with Autism require continuous and intensive testing and home therapy.

61.     Specifically, Tyler requires continuing treatment from several health care providers.

62.     Furthermore, Tyler requires Speech, Occupational, Physical, and Special Instruction Therapy at least three times per week each.

63.     Plaintiff and his wife used their best efforts to take turns to tend to Tyler's illness and the extensive regime of therapy he was undergoing at home.

64.     In or about mid 2002, Plaintiff's wife ceased employment so that she could stay at home with Tyler and tend to his illness and be present at therapy sessions.

65.     With the loss of his wife's income, all financial responsibilities of the Frazier family fell upon Plaintiff.

66.    As a result of the economic decline from a double-income to a single-income, oftentimes Plaintiff and his family suffered from financial hardship.

67.    In addition, despite the substantial therapy treatments Tyler was receiving, his inability to communicate with his parents was a huge challenge for the Fraziers.

68.    Furthermore, Tyler had sensory issues which limited his diet.  That, and other factors resulting from his illness caused Tyler to suffer from high fevers that kept him in and out of hospitals on a constant basis.

69.    In sum, since Tyler was diagnosed with Autism, Plaintiff's life changed dramatically.  He and his wife were no longer able to do the normal things other parents do. Furthermore, Plaintiff had no other family members to help him and his wife care for Tyler's illness and the two of them were unable to afford additional child or nursing care.

70.    The need for a double-income to afford the therapies and other treatments for Tyler forced Plaintiff's wife to return to the work force.

71.    As a consequence of her return to work, Plaintiff and his wife would split the shifts for Tyler's continuous care.

72.    Tyler requires constant parental care relating to toileting, feeding, clothing, hygienic care, safety, communication, health, and education.

73.    Plaintiff and his wife have to be in constant communication with Tyler's schooling and special needs education.

## TIFFANY DISCRIMINATES AGAINST PLAINTIFF AND DOES NOT PROVIDE HIM THE ABILITY TO CARE FOR HIS AUTISTIC SON

74.    At all relevant times herein, Plaintiff's employer, and each one of his managers, were fully aware of Plaintiff's personal circumstances, specifically the required medical and therapeutic care for Plaintiff's Autistic son.

75.    Any time Plaintiff would be late or absent, it was because he was caring for his Autistic son.

76.    Plaintiff always informed Tiffany immediately upon any time his need to take FMLA arose.

77.    Plaintiff received no accommodations (FMLA or otherwise) for the care of his son's illness, despite his many requests.

78.    Instead of accommodating Plaintiff and assisting him and his wife with the care of their Autistic son, Tiffany sought to discipline Plaintiff for the times he was late or absent due to the times he needed to provide medical or therapeutic care for his son.

79.    Tiffany did not discipline Plaintiff's similarly situated Caucasian coworkers for lateness or absence based upon medical reasons.

80.    For example, in 2003, Ms. Tracey Lambert became the manager of the engraving department.

81.    During her tenure, Plaintiff was put on written notice for being late or absent, despite Ms. Lambert's knowledge that Plaintiff was spending time trying to care for his Autistic son who was either in therapy or in the hospital.

13

82.    On one incident, when Tyler became severely ill, Plaintiff had to leave early to tend to Tyler.

83.    Ms. Lambert asked Plaintiff if he had a car so Plaintiff can pick him up and return back to work. Plaintiff explained to her that he did not have a car and had no one else to watch his son. Plaintiff also explained that his wife would not be home in time to take over for him to be able to return to work. Ms. Lambert then became very irate, and responded by saying, **"Well, do what you gotta do."**

84.    When Plaintiff later inquired of Ms. Lambert about FMLA leave that would entitle him to unpaid leave to care for his son, Ms. Lambert angrily informed Plaintiff that, **"You are not entitled to FMLA leave. Your son is not sick enough. Besides, that is your wife's job. She is responsible for taking care of your son."**

85.    Despite Ms. Lambert's statements, unbeknownst to Plaintiff, Plaintiff was indeed entitled to FMLA leave to care for his Autistic son, Tyler, who required extensive therapies and doctor visits.

86.    In March 2004, the engraving department was transferred to a new location called the CFC (Customer Fulfillment Center) in Whippany, New Jersey.

87.    Plaintiff's new manager, Dave Wilson, was informed by his previous managers that Plaintiff had a son with Autism, who needed constant medical and therapeutic care. Nevertheless, Plaintiff continued to receive reprimands for his absences, all due to the care of his Autistic son.

88.    During this time, Plaintiff was never reprimanded for his quality of work, his work attitude or performance.

14

89.    In March 2005, Mr. Wilson commenced Tiffany's final and most egregious campaign to discriminate against Plaintiff and finally terminate him from the company.

90.    Despite his 15+ year tenure at Tiffany, which earned him 4 weeks' vacation along with personal days, floating holidays and 10 sick days, Plaintiff received write-ups for excessive absences and lateness despite Tiffany's knowledge that these "absences" and "lateness" were used by Plaintiff to care for his Autistic son, and were permissible leave time under FMLA.

91.    Other similarly situated Caucasian employees who sought FMLA leave and other sick leave were not disciplined in the same fashion as was Plaintiff.

92.    In March 2005 and again in December 2005, Tiffany complained of Plaintiff's absences and lateness knowing that the reason for any unexcused lateness or absence was due to the care of his Autistic son who was either in therapy or in the Hospital.

93.    In April 2006, Plaintiff received another Performance Management Process Review from Mr. Wilson. (Exhibit B.)

94.    At that time, Mr. Wilson told Plaintiff that he saw an improvement in Plaintiff's attendance and in job performance.

95.    Nevertheless, despite Plaintiff's improvement, Mr. Wilson still gave Plaintiff a poor review.

96.    There are six categories listed under the Factor Ratings Column: Knowledge, Productivity, Thinking, Interpersonal, Communication, and Self-Management.  Plaintiff scored "Good" in ALL ratings except "Self-Management" which he was rated "Adequate."  Despite a predominantly "Good" performance review, Mr. Wilson rated Plaintiff overall as "Adequate."

97.    Surprisingly, despite his "Adequate" rating, in the comments section of Plaintiff's final review (Exhibit B, page 13), Plaintiff's manager wrote the following: **"Russell was able to complete over 400 pieces more in 2005 than in 2004, which is a great achievement. His quality of work was very good and he overcame some engraving obstacles, which he needs to continue to work on. Although Russell's attendance and overall work habits improved in 2005, he still needs to make some serious improvements if he is to be successful with the company in the future. He needs to be more responsible and make the effort to be here each day and on time as well. Russell has a great talent that we don't want to lose in our department, however it is up to him to make the effort to improve his attendance now and going forward."**

98.    It was apparent that despite Plaintiff's excused absences and lateness and his continued efforts to successfully juggle his responsibilities to Tiffany and to his Autistic son, Mr. Wilson sought to provide Plaintiff with poor performance reviews in the hopes of terminating Plaintiff and finally rid Tiffany of Plaintiff, the only African American engraver, and an engraver with a plethora of personal medical problems that neither Mr. Wilson, nor Tiffany, wanted to deal with.

99.    Mr. Wilson made it clear in Plaintiff's April 2006 performance review, that no matter how much Plaintiff improved or how hard he tried to balance his personal and professional responsibilities, Mr. Wilson was not going to keep Plaintiff employed at Tiffany in his department.

100.    Accordingly, in or about April 2006, Plaintiff requested of Mr. Wilson a transfer in hopes of a change of environment and being able to be closer to home so that Plaintiff could continued being an accomplished engraver at Tiffany while adhering to his personal responsibilities to his Autistic son.

101.    In response to Plaintiff's request, Mr. Wilson told Plaintiff that he could not be transferred due to him being on a warning notice and his overall review being "Adequate" – a review standard arbitrarily and capriciously set by Mr. Wilson himself despite Plaintiff's "impressive" work performance.

102.    Mr. Wilson then informed Plaintiff that he would have to wait until December 2006 for any transfer.

## TIFFANY DISCRIMINATES AND RETALIATES AGAINST PLAINTIFF

103.    On June 12, 2006, in response to Mr. Wilson's arbitrary and capricious withholding of Plaintiff's request for a transfer, Plaintiff once again contacted Jonathan Sack of the law offices of Sack & Sack.

104.    On that same day, June 12, 2006, Mr. Sack emailed Patrick Dorsey, who is the Senior Vice President and General Counsel at Tiffany, informing him of his representation of Plaintiff, Harry Frazier, and requesting that Mr. Dorsey "call" Mr. Sack to discuss Mr. Frazier's employment. (Exhibit C)

105.    On June 13, 2006, the very next day following the dispatch of Mr. Sack's email to Mr. Dorsey, Plaintiff was called into Mr. Wilson's office.

106.    At that time, Mr. Wilson proceeded to talk to Plaintiff about Tiffany's point system and his continuous absences.

107.    Plaintiff explained to Mr. Wilson that any absences were due to his caring for his Autistic son and that Plaintiff had plenty of vacation days to cover any absences as a result of his 15+ years at Tiffany.

108.    Mr. Wilson did not respond to Plaintiff nor did he inform Plaintiff at that time that Plaintiff's job with Tiffany was terminated.

109.    On June 13, 2006, the very next day following Mr. Sack's letter, in retaliation for Plaintiff's retention of counsel, Mr. Dorsey responded to Mr. Sack's email by writing, **"I am sorry to report that when I called the vice president in charge of Mr. Frazier's division this morning I learned that a termination notice already had been signed due to his excessive absences and lateness."**

110.    As of Mr. Sack's receipt of Mr. Dorsey's June 13th email, Plaintiff was still not informed that his employment with Tiffany had been terminated.

111.    On June 15, 2006, Plaintiff arrived at work at Tiffany and worked until 2pm that afternoon.

112.    Around that time, Plaintiff was called into Mr. Wilson's office who told Plaintiff that he was terminated due to his being late nine times and having unexcused and unscheduled absences.

113.    Mr. Wilson presented Plaintiff with a form and asked for his signature, which Plaintiff refused to sign on the basis that Mr. Wilson's accusations were both false and inaccurate.

114.    Accordingly, on or around June 15, 2006, Plaintiff was singled out and unlawfully terminated from Tiffany without any reason, notice, justification or cause except in retaliation of his lawful complaints concerning discrimination by Defendants on the basis of Plaintiff's race. (see, Exhibit D, "Termination Notice")

115.    There is no legitimate business justification for such targeting and persecution of Plaintiff to exist at Tiffany by Plaintiff's supervisor, Mr. Wilson and others.  Such debilitating and discriminatory behavior did not further the business of Tiffany.

116.    In Plaintiff's 13 years as an engraver (and 15 years of employment), Plaintiff was the only African American engraver employed by Tiffany out of approximately 21 engravers.

117.    Tiffany and its employees knew of Plaintiff's need for FMLA leave and knew Plaintiff's "excessive absences and lateness" were due exclusively to the caring for his Autistic son, but nevertheless denied Plaintiff any type of FMLA leave and discriminated against Plaintiff by treating him differently than other similarly situated Caucasian employees at Tiffany.

118.    Plaintiff spoke with several other Caucasian employees in the hand engraving department who were continuously late and absent for even non-medical (and non-FMLA) reasons and never received a written warning or notice.

119.    When Plaintiff specifically asked one Caucasian engraver if he was ever disciplined for being late or absent, he responded, **"Never, Never, Never!"**

120.    One former manager of Tiffany (who is currently employed as an engraver) was known to take Caucasian employees from the New Jersey Hand Engraving department (to the exclusion of Plaintiff) to local adult entertainment clubs during lunch.  After the midday

rendezvous, that Manager would often have to leave work to go home because of his extreme intoxication during lunch. When Plaintiff asked this manager if he was ever disciplined by Tiffany due to unexcused lateness or absences he admitted that he only received a "verbal warning."

121.    Another similarly situated Caucasian coworker from the hand engraving department who was constantly late and absent on a weekly basis, when asked by Plaintiff if she had ever received a written notice or warning because of her lateness or absences responded, **"What's that?"**

122.    When Plaintiff explained to her what he meant by "written warning" she responded, **"No."**

123.    All of Plaintiff's managers dating back to 2001, including the Director and Human Resources were aware of his son's severe disability.

124.    Plaintiff was compliant with all Tiffany policies and followed all department rules and regulations.

125.    Plaintiff's performance at Tiffany was indisputably (and admittedly) excellent.

126.    Plaintiff received numerous praises on his work from the administrative staff and other employees throughout the company.

127.    Plaintiff also received a complimentary $50.00 gift card from his director Mr. Rick Vander Wende for making no engraving errors in a month, as well as a letter congratulating him on a job well done for a prestigious client.

128.   When it came to his work, Plaintiff believed in quality over quantity, because Plaintiff took pride in every job that Plaintiff engraved.  Mr. Wilson himself admitted what a **"great achievement"** it was for Plaintiff to complete over 400 pieces more in 2005 than in 2004.

129.   If Plaintiff called out sick on any given day to care for his son, he would call hours before his scheduled time of work and provide the Manager with doctor's notes (which Mr. Wilson sometimes did not accept).

130.   It is no coincidence that Tiffany never reprimanded or disciplined Plaintiff for lateness or absenteeism prior to 2002 – the year Tyler was diagnosed with Autism.

131.   If Plaintiff took days off such as vacation days, he would put in his request ahead of time.

132.   Plaintiff was replaced by a less-experienced, less-qualified Caucasian who did not have a "special needs" family member that required constant medical attention and therapy.

133.   Prior to the commencement of this action, Plaintiff served a copy of this Complaint to the following persons at the last known address set forth in accordance with the New York City Administrative Code § 8-502(c):

Corporation Counsel of New York City
100 Church Street, Room 4313
New York, New York 10007

NYC Commission on Human Rights
40 Rector Street, 9th Floor
New York, New York 10006

| LEGAL CLAIMS |
| --- |

## AS AND FOR A FIRST CAUSE OF ACTION

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000e

134.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

135.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's race, African American, and show an animus of racial bias.

136.    Defendants' animus towards Plaintiff's race is revealed in instances where similarly situated Caucasian employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

137.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

138.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

139.    As a result of Defendants' actions, Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

140.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his race and in

22

retaliation against his in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

141.    As a proximate result of Defendants' aforementioned race discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

142.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

143.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

144.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

145.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

146.    In committing the acts alleged herein, Defendants, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton

disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF RACE UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

147.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

148.   Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's race, African American, and show an animus of racial bias.

149.   Defendants' animus towards Plaintiff's race, African American, is revealed in instances where similarly situated Caucasian employees were treated differently than Plaintiff in respect to of his terms, conditions, and privileges of employment.

150.   As a result of Defendants' actions, Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

151.   The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his race and in retaliation against his in violation of the provisions of the NYSHRL § 296(1)(a).

152.   As a proximate result of Defendants' aforementioned race discrimination against

Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

153.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

154.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

155.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

156.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

157.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such

conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF RACE UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-107

158.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

159.   Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's race, African American, and show an animus of racial bias.

160.   Defendants' animus towards Plaintiff's race, African American, is revealed in instances where similarly situated Caucasian employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

161.   As a result of Defendants' actions, Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

162.   The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his race and in retaliation against his in violation of the provisions of the NYCHRL § 8-107.

163.   As a proximate result of Defendants' aforementioned race discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

164.   As a further proximate result of Defendants' actions, Plaintiff has and will

continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

165.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

166.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

167.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

168.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000e

169.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

170.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

171.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC.

172.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC.

173.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating his employment.

174.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

175.    The aforementioned acts of Defendants constitute unlawful retaliation against

Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

176.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

177.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

178.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

179.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

180.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

181.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and

indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR AN FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

182.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

183.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYSHRL § 296 (1) (a).

184.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC.

185.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC.

186.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating his employment.

187.    As a result of Defendants' actions, Plaintiff has been unable, despite reasonable

efforts, to find comparable employment.

188.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 296 (1) (a).

189.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

190.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

191.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

192.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

193.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

194.    In committing the acts alleged herein, Defendants acted in an outrageous and

malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107

Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

195.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYCHRL § 8-107.

196.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC.

197.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC.

198.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendants and appropriate authorities, including legal counsel and the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating his employment.

32

199.    As a result of Defendants' actions, Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

200.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-107.

201.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

202.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

203.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

204.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

205.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

206. In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### AGAINST WILSON (NYSHRL - AIDING AND ABETTING)

207. Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

208. As a result of the aforementioned actions, Defendant Wilson has discriminated against Plaintiff on account of his race with respect to the terms, conditions and privileges of his employment in violation of New York Executive Law § 290 et seq.

209. As a result of the aforementioned actions, Defendant Wilson has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

210. As a result of Defendant Wilson's discrimination (and aiding, abetting and inciting discrimination) against his, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

34

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### AGAINST WILSON (NYCHRL - AIDING AND ABETTING)

211.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

212.   As a result of the aforementioned actions, Defendant Wilson has discriminated against Plaintiff on account of his race with respect to the terms, conditions and privileges of his employment in violation of New York City Administrative Code § 8-101 et seq.

213.   As a result of the aforementioned actions, Defendant Wilson has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

214.   As a result of Defendant Wilson's discrimination (and aiding, abetting and inciting discrimination) against his, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## AS AND FOR A NINTH CAUSE OF ACTION

### DISCRIMINATION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT OF 1993, AS CODIFIED, 29 U.S.C. § 2601 ET SEQ.

215.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

216.   Plaintiff exercised his rights or attempted to exercise his rights protected under the FMLA.

217.   Plaintiff was qualified for his position.

218.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's exercise of his rights or attempts to exercise his rights protected under the FMLA

219.    Defendants' animus towards Plaintiff's exercise of his rights or attempts to exercise his rights under the FMLA is revealed in instances where similarly situated employees who did not exercise their rights under the FMLA were treated differently than Plaintiff in respect to of their terms, conditions and privileges of employment.

220.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under FMLA.

221.    These employment practices violate the FMLA.

222.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his exercise of his rights or attempts to exercise his rights in violation of the provisions of the FMLA.

223.    As a proximate result of Defendants' aforementioned discrimination against Plaintiff under FMLA, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

224.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

225.    As a further proximate result of Defendants' actions taken because of Plaintiff's exercise of his rights or attempts to exercise his rights under FMLA, Plaintiff has and will

continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

226.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

227.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $5,000,000.00 in compensatory damages from Defendant in addition to all other amounts sought herein.

228.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A TENTH CAUSE OF ACTION

**RETALIATION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT OF 1993,
AS CODIFIED, 29 U.S.C. § 2601 ET SEQ. AND PURSUANT TO 29 C.F.R. § 825.220 ET SEQ.**

229.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

230.    Plaintiff exercised his rights or attempted to exercise his rights protected under the FMLA.

231.    Plaintiff was qualified for his position.

232.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's exercise of his rights or attempts to exercise his rights protected under the FMLA

233.    Defendants' animus towards Plaintiff's exercise of his rights or attempts to exercise his rights under the FMLA is revealed in instances where similarly situated employees who did not exercise their rights under the FMLA were treated differently than Plaintiff in respect to of their terms, conditions and privileges of employment.

234.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under FMLA.

235.    These employment practices violate the FMLA.

236.    The aforementioned acts of Defendant constitute unlawful retaliation of Plaintiff in the terms, conditions and privileges of his employment in interference of his exercise of his rights or attempts to exercise his rights in violation of the provisions of the FMLA.

237.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff under FMLA, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

238.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

239.    As a further proximate result of Defendants' actions taken because of Plaintiff's exercise of his rights or attempts to exercise his rights under FMLA, Plaintiff has and will

continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

240.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

241.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendant, jointly and severally, in addition to all other amounts sought herein.

242.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## ATTORNEY'S FEES AND COSTS

243.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with Defendants without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

244.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly. In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendants so that they be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.    An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salary and benefits had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%;

II.    An award of compensatory damages not less than $3,000,000.00;

III.    An award of punitive damages not less than $3,000,000.00;

IV.    An order enjoining Defendant from engaging in the wrongful practices alleged herein;

V.    An award of prejudgment interest, costs and attorney's fees; and

VI.    Such other and further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated:        New York, New York
              October 16, 2007

                              Respectfully submitted,

                              **SACK & SACK, ESQS.**

                    By:       _____
                              Jonathan Sack, Esq.  (JSS 1835)

                    **Attorneys for Plaintiff**
                    **HARRY RUSSELL FRAZIER**
                    110 East 59th Street, 19th Floor
                    New York, New York 10022
                    Tel.: (212) 702-9000
                    Fax: (212) 702-9702

**EXHIBIT A**

## DISMISSAL AND NOTICE OF RIGHTS

To:   Harry R. Frazier
      109-35 111 Street
      2nd Floor
      Richmond Hill, NY 11420

From:   New York District Office
        33 Whitehall Street
        5th Floor
        New York, NY 10004

☐   On behalf of person(s) aggrieved whose identity is
    CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2007-02289 | **Electra Yourke,**<br>**Supervisory Investigator** | **(212) 336-3751** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐   While reasonable efforts were made to locate you, we were not able to do so.

☐   You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

_____
**Spencer H. Lewis, Jr.,**
**Director**

7/24/07
*(Date Mailed)*

Enclosures(s)

cc:   TIFFANY & CO.
      Nancy C. Waite
      600 Madison Avenue
      New York, NY 10022
      Legal Department

      Eric R. Stern
      SACK & SACK
      110 East 59th Street, 19th Floor
      New York, NY 10022

**INFORMATION RELATED TO FILING SUIT**
**UNDER THE LAWS ENFORCED BY THE EEOC**

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS   --   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS   --   **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before <u>7/1/02</u> -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION   --   **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months of this Notice</u>**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**EXHIBIT B**

Russell Frazier

TIFFANY & CO.
HUMAN RESOURCES

# Performance Management Process Packet: Non Exempt

## How to use this document

## Part A: Progress on Critical Responsibilities

The manager describes the employee's performance on critical responsibilities as defined in the employee's job description.

## Part B: Factor Ratings

The manager provides a rating for each of the Non-Exempt Competencies by choosing one of the available options from Outstanding through Unsatisfactory. Factor ratings will be automatically calculated based on these individual ratings. The manager is provided with space to make additional comments regarding the employee's general performance on each Factor.

## Part C: Overall Rating

The manager reviews the information in Parts A and B and any additional considerations, and then selects a rating that best reflects the employee's overall performance during this review cycle. Additional space is provided for the manager to include comments to support the selected rating.

## Part D: Development Opportunities and Action Plan

The manager and employee discuss the employee's developmental opportunities based on the current review and outline an action plan to guide the employee in achieving these developmental goals in the upcoming year. Space is provided for the employee to offer additional comments regarding the review and performance discussion.

## Part E: Signatures

The manager conducts the performance review conversation, and ensures that all necessary signatures are obtained. The manager then submits the entire document to Human Resources, and provides a copy of the document to the employee

TIFFANY & CO.
HUMAN RESOURCES

# Performance Management Process Form – Non-Exempt

**Employee Name:** Russell Frazier

**Position Title:** Hand Engraver

**Appraiser Name:** Dave Wilson

**Employee Department:** Hand Engraving

**Employee I.D. Number:** 7048

**Employee Location:** CFC

**Date of Appraisal Discussion:**

**Time in Position:** 15 years

**Performance Period (mm/yr):**

**Start:** 2/05          **End:** 1/06

## Part A: Progress on Critical Responsibilities

*In Column A, list all of the critical responsibilities required for this position, as identified in the job description. In Column B, describe the employee's performance on these responsibilities by adding comments or examples that describe the degree to which each responsibility was accomplished during this review period.*

| | A. Critical Responsibilities: | B. Comments/Examples: |
|---|---|---|
| 1 | Hand engrave Tiffany & Co. merchandise in a timely manner while maintaining the highest standards of quality. | Russell completes the majority of his work on time and consistently meets our high quality standards. |

TIFFANY & CO.
HUMAN RESOURCES

| | |
|---|---|
| **2** Record hand engraving piecework production and other job related information as needed. | Russell keeps a neat and well-organized production log and cooperates during any auditing that takes place with his production and pay. |
| **3** Communicate with administrative staff to coordinate smooth processing of orders and to ensure a mutual understanding of engraving policies and customer needs. | Russell is a good communicator who will ask questions of the admin staff and the Master Engraver's when necessary. |

TIFFANY & CO.
HUMAN RESOURCES

| | | | |
|---|---|---|---|
| 4 | Attend department meetings, seminars and training sessions as requested by management. | Russell attends all department meetings and other functions when necessary. | |
| 5 | | | |
| 6 | | | |

TIFFANY & CO.
HUMAN RESOURCES

## Part B: Factor Ratings

**RATING SCALE**

| | | DEFINITION |
|---|---|---|
| Outstanding | 6 | Exceeds expectations. Employee has mastered this competency. |
| High | 5 | Meets and often exceeds expectations. Employee has demonstrated exceptional performance in this competency. |
| Good | 4 | Meets main expectations. Employee has demonstrated consistent competence in this competency. |
| Adequate | 3 | Inconsistently meets expectations. Employee has demonstrated some deficiencies in this competency. |
| Needs Improvement | 2 | Poor performance. Employee needs significant development in this competency. |
| Unsatisfactory | 1 | Unacceptable performance. Employee has failed in this competency. |

*Rate the employee's performance on each factor using the rating scale above, by selecting from the drop-down lists of options in the dialog box provided. Use the Comments sections to support your ratings or provide examples of the employee's general performance on each Factor.*

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| Knowledge | • Technical & Job | Has the technical skills required to complete tasks (e.g., machine operations, artistic skill, computing, tools, product knowledge, business/industry knowledge) | High |
| | • Process | Is aware of and uses correct processes and procedures to complete work | Good |
| | • Versatility | Takes on varied responsibilities or cross-functional assignments as needed | Good |
| | Comments: | | Factor Rating: Good |

TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| | | Russell has developed a tremendous amount of confidence within the past year and has produced many fine engravings as well. He has proven to be versatile by working on some large custom jobs and other merchandise that has given him some trouble in the past. He does need to be more confident in his abilities when engraving inside rings. Russell understands how we process our work in the department and rarely leaves any order on his desk that is past the VAS Exit Date. | |

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| Productivity | • Quality/ Accuracy | Completes quality work that is accurate and meets standards, and appropriately communicates quality issues | High |
| | • Quantity/ Timeliness | Completes work efficiently while meeting deadlines and/or quantity requirements | Good |
| | • Attention to Detail | Pays sufficient attention to the details of his/her work; does not miss fine points | Good |
| | • Planning/ Organizing | Plans and/or uses his/her time to complete tasks effectively | Good |
| | Comments: | Factor Rating: | Good |

TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| | | Russell's quality of work is excellent when he puts his mind to it. He strives to not let outside distractions impede his ability to meeting the demands of the customer. Russell stays organized and completes the majority of his tasks in an effective manner. | |

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| Thinking | • Problem-Solving | Utilizes appropriate information to make effective decisions and take action | Good |
| | • Ability to Learn | Demonstrates the desire and capacity to gain greater expertise and skill | Good |
| | Comments: | Factor Rating: | Good |

TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|--------|-----------|----------------------------------|--------|
| | | Russell proved that he could learn more this year by working on featheredge. He needs to be confident in himself and his work to stay on the right path to make sure engraving other merchandise continues to improve. | |

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|--------|-----------|----------------------------------|--------|
| Interpersonal | • Teamwork | Works with others by sharing ideas and information in order to meet a common goal and is open to the ideas and suggestions of others | Adequate |
| | • Service Focus | Focuses on understanding and meeting the needs of both internal and external customers | Good |
| | • Respect | Demonstrates respect and professional behavior toward others | Good |
| | Comments: | | Factor Rating: Good |

TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| | | Russell has made some strides to improve his attendance and lateness issues this year, however he needs to make a major improvement if he is to be successful in this position going forward. He likes being part of the team, however his absenteeism causes excessive monitoring of his work that needs to be re-assigned at times. Russell is always respectful towards his peers and management, no matter what the situation may be. | |

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| Communication | • Listening | Demonstrates understanding through both words and actions | Good |
| | • Clarity of Expression | Expresses self clearly and concisely; tailors his/her communication to the listener; ensures that others understand what he/she is trying to say | Good |
| | Comments: | Factor Rating: | Good |

TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| | | Russell has followed the call-in procedure much better over the past year, as he advises management of his situation in a timely manner if he can't make it in. He speaks clearly and is very open to management regarding any issues that he may be encountering. | |

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| Self-Management | • Adherence to Company Policies | Consistently adheres to and demonstrates an understanding of the importance of company policies and procedures (e.g., attendance, safety, business conduct) | Needs Improvement |
| | • Ability to Follow Directions/Processes | Is open to direction from others and values the existing guidelines | Good |
| | • Flexibility/Adaptable to Change | Adapts to a shifting environment with changes in priority, procedure, and organizational structure | Adequate |
| | • Trustworthiness | Demonstrates integrity, dependability, and a track record of following through on commitments | Needs Improvement |
| | • Positive Approach | Maintains a positive outlook about his/her work, creating a positive work environment | Good |
| | • Ability to Work Under Pressure | Maintains effectiveness despite time pressure or stressful situations | Adequate |


TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating | |
|--------|-----------|-----------------------------------|--------|--|
| | Comments: | | Factor Rating: | Adequate |

TIFFANY & CO.
HUMAN RESOURCES

| Factor | Competency | Definition/Behavioral Descriptors | Rating |
|---|---|---|---|
| | | Russell's attendance continues to be an issue that needs immediate attention. He had 16 unscheduled absences and 29 late arrivals in 2005. His Warning Notice was extended as of December 21st, due to the ongoing issues. Russell adheres to all company policies regarding Health & Safety. | |
| | | Although he continued to have lateness issues as well this past year, he improved in this area as compared to 2004. He must adhere to the company policy regarding attendance in 2006, if he expects to continue working for Tiffany & Co. | |
| | | His attendance problems affect so many other areas of his job including trustworthiness, dependability and adapting to shifting workloads. He also must make the effort to spend more time at his workstation throughout the day. Through all of this Russell always tries to remain positive and keeps his head up even when things aren't going well. | |

**TIFFANY & CO.**
HUMAN RESOURCES

## Part C: Overall Rating

*Review the information from previous sections of this form in order to provide an overall rating in the Manager's Overall Rating section (Column C, below). Consider the employee's Factor Ratings (provided in Column A, below). However, please remember that other variables should also be considered, including those listed in Column B below. Please take these variables into account, and provide your Overall Rating by selecting the appropriate option, from Outstanding through Unsatisfactory. Use the Comments section below to provide any additional comments or examples that validate your overall rating.*

| C. Factor Ratings | | D. Also Consider | E. Manager's Overall Rating |
|---|---|---|---|
| Knowledge: | Good | ■ The employee's progress in achieving key accountabilities and development goals (Part A) | Adequate-3 |
| Productivity: | Good | ■ That a given factor may be more versus less important to overall successful performance | |
| Thinking: | Good | ■ That ratings should be based on the employee's behavior throughout the performance period, not just at the beginning or the end of the year | |
| Interpersonal: | Good | ■ That consistent behavior should be considered more important than isolated incidents | |
| Communication: | Good | ■ Whether the employee has any active progressive discipline documentation | |
| Self-Management: | Adequate | ■ Any other issues or achievements that should be considered | |

## Comments:

*(In the space provided below, please describe any considerations that influenced the overall performance rating.)*

Russell was able to complete over 400 pieces more in 2005 than in 2004, which is a great achievement. His quality of work was very good and he overcame some engraving obstacles, which he needs to continue to work on. Although Russell's attendance and overall work habits improved in 2005, he still needs to make some serious improvements if he is to be successful with the company in the future. He needs to be more responsible and make the effort to be here each day and on time as well. Russell has a great talent that we don't want to lose in our department, however it is up to him to make the effort to improve his attendance now and going forward.

TIFFANY & CO.
HUMAN RESOURCES

## Part D: Development Opportunities and Action Plan (to be completed during performance discussion)

*In collaboration with the employee, identify development needs and/or learning opportunities for this employee. Then, with the employee, outline an action plan that describes the steps he/she will take to achieve these goals in the upcoming year, along with the resources to do so. Some discussion points to incorporate into your discussion include:*

- *What knowledge and/or skills would the supervisor prioritize as most likely to maximize the employee's performance?*

TIFFANY & CO.
HUMAN RESOURCES

- What would the employee like to learn (knowledge and/or skills) that will impact his/her ability to achieve the greatest level of success?
- What direction(s) would the employee like to pursue as he/she moves forward professionally?

| | Development & Learning Opportunities: | Action Plan & Suggested Resources: |
|---|---|---|
| 1 | Make effort to increase production numbers by 20 pieces per month as compared to 2005. | Use production sheet given to you by management each month to track your progress. |
| 2 | Engraving inside rings and bangles. | Train with Master Engraver's to ensure you can meet this job requirement. Must be completed before start of 3rd quarter of 2006. |

TIFFANY & CO.
HUMAN RESOURCES

3

**Employee Comments:**

TIFFANY & CO.
HUMAN RESOURCES

## Part E: Signatures

| | | |
|---|---|---|
| **Reviewer**: By signing this form, I confirm that I have shared the content of this form with this employee and will submit a copy to Human Resources.<br><br>*Note: If a rating of NI or U is assigned, prior approval of Human Resources is required.* | Signature | Date |
| ***Manager (if reviewer is not of management level)***: By signing this form, I confirm that I am aware of the content and ratings within the document | Signature | Date |
| **Employee:** I acknowledge receipt of this appraisal, whether or not I agree with its content.<br><br>☐ I have submitted a discrepancy statement. | Signature | Date |
| **Human Resources** *(if applicable)*: | Signature | Date |

**EXHIBIT C**

# SACK & SACK

ATTORNEYS-AT-LAW
110 EAST 59TH STREET, 19TH FLOOR
NEW YORK, NEW YORK 10022
PHONE: (212) 702-9000 • FAX: (212) 702-9702

**Jonathan Sack**
ext.:    207
e-mail:  JSack@SackandSack.com

June 12, 2006

**VIA E-MAIL TO**:    Patrick.Dorsey@Tiffany.com

Patrick Dorsey, Esq.
Senior Vice President, Secretary
And General Counsel
Tiffany & Co.
600 Madison Avenue
New York, New York  10022

Re:    <u>**Harry Frazier**</u>

Dear Mr. Dorsey:

Please note this firm represents Harry Frazier of 95-49 113th Street, 1st Floor, Richmond Hill, New York  11419.  Please call me to discuss his employment.

Very truly yours,

*/s/ Jonathan Sack*

Jonathan Sack

JSS/zs

**EXHIBIT D**

ATTACHMENT B

## TERMINATION NOTICE

T4

☐ Conduct-Related
☒ Job Performance-Related

**TO:** Harry Frazier    Hand Engraver    7048
*Employee Name*    *Title*    *Employee Number*

**DATE:** 6/15/06    Location/Company: CFC/Tiffany + Co.

Your employment with the Company has been terminated because of your job performance or conduct.  Listed on the attached page(s) are the job-performance deficiencies or conduct for which you have been terminated.

| Employee Level | Management Approval | | HR Approval |
|---|---|---|---|
| Manager or below | Employee's Manager: *(signature)* Name: David Wilson Title: Manager - Hand Engraving Date: 6/13/06 | | Human Resources Director*: *(signature)* Name: Susan M. Bennett Date: 6/15/06 |
| | Next Level Management: *(signature)* Name: R. Vander Wende Title: Director Date: 6/14/06 | | * or HR Manager for seasonal employees. |
| Director/ Group Director | Employee's Manager: Name: Title: Date: | | VP HR: Name: Date: |
| | Next Level Management: Name: Title: Date: | | |
| Vice President and above | Employee's Manager: Name: Title: Date: | | SVP HR Name Date: |
| | Next Level Management: Name: Title: Date: | | |
| Termination for Gross Negligence | Additional Level of Management Approval: (Retail – GVP or above required) | Name: Title: Date: | |

Issued by: *(signature)*
Name: Dave Wilson
Title: Manager
Date: 6/15/06

Witnessed by:
Name:
Title:
Date:

Number of Pages Attached:_____

6/06 PG

Receipt Acknowledged by Employee: _____ Date:_____

Ⓛ EMPLOYEE REFUSED TO SIGN DOCUMENT.
SK 6/15/06



**Employee Job Action Form**

Company Name: Tiffany + Co.

## Employee Information

Employee ID (Leave blank for New Hire): 7048

Last Name (Print): Frazier

First Name (Print): Harry

Current Department (GL Location & Cost Center): 1010-3227

Location: (Physical location/Building/Branch) CFC-NJ

Effective Date of Action*: 06/16/06

*NOTE: Effective date for Termination / Retirement is the first day in termination status, NOT the last day worked.

## Form Submitted by:

Contact Name (Print): Dave Wilson

Phone/Extension: 8648

Date Form Completed: 6/7/06

## Action(s) Select Appropriate Action(s) below

- [ ] Hire (Section I, II & III)
- [ ] Rehire (Section I & II)
- [ ] Transfer (Section I & II)
- [ ] Promotion (Section I & II)
- [ ] Demotion (Section I & II)
- [ ] Pay Rate Change (Section II)
- [ ] Commence/Return Leave (Section IV)
- [ ] Return to Work Program (Data Change & Section V)
- [x] Termination (Section VI)
- [ ] Termination w/Pay (Section VI)
- [ ] Retirement (Section VI)

Reason for the Action (See back of Form for Reason Codes): ATT

## Section I (Job Information)

If this employee requires a sales clerk number a separate Sales Clerk Maintenance Form needs to be attached.

| New Position Code: | New Position Title: | | | | New Hrs per Week: |
|---|---|---|---|---|---|

| | TIFFANY & CO. | | | TIFFANY NJ Inc | Iridesse |
|---|---|---|---|---|---|
| New Pay Group (See back of form) | [ ] TEF Wk-Current | [ ] TBC-BWkly-Current | [ ] TBA BiWkly 2 Adv | [ ] TF1-TIF (QA) Wkly Current | [ ] IRC BWkly Current |
| | [ ] TWP Wk-1 Wk Lag | [ ] TBP BWkly-1 Wk lag | | [ ] TF2-TIF (QA) 1 Wk Lag | [ ] IRP BWkly 1 Wk Lag |
| Payroll Information | Empl Type: [ ] Salaried [ ] Hourly | | Tax Location (Work State): | | |

## Section II (Pay Rate Information)

- [ ] Annual Rate (Exempt/Salaried) $
- [ ] Hourly Rate (Non-Exempt/Hourly) $
- [ ] Target Bonus _____ %
- Increase %:
- [ ] Commission %
- Other Comp:

Comments: (For certification, please specify level or function of certification and Title)

## Section III (Hire Source Information)

Hire Source: (Please see back of form)

Employee that made the referral:

Specific Referral Source: (e.g. NY Times)

Employee Referrals:
- [ ] Regular FT $650
- [ ] PT/ST/Temp $350
- [ ] Hard to Fill $2000
- [ ] ST/Temp Referral Award $150
- [ ] PT/ST/Temp Status Change to Regular FT $300

## Section IV (Leave of Absence/Return from Leave)

- [ ] Personal (Please attach LOA application)
- [ ] Military
- [ ] Other (Discuss with HR)
- [ ] Return from Leave

Begin Leave Date:

Estimated Return Date:

Actual Return Date:

Comments:

## Section V (Return to Work Program)

- [ ] Commence Return To Work Program
- [ ] End Return to Work Program

Hours per Week:

Adjusted Pay Rate:

Actual Return Date:

## Section VI (Termination / Termination w/Pay / Retirement)

- [ ] Voluntary (Attach Resignation Letter and schedule an exit interview)
- [x] Involuntary (Attach approved documentation that supports termination)

Last Day Worked: 06/15/06

Work Location and State: CFC-NJ

Eligible for Rehire*: [ ] Yes *To determine ineligible for rehire status, contact your local HR Department

Unused Hours: Vacation: Holidays:

- [ ] No, Insufficient notice given
- [x] No, Performance/Conduct issues formally addressed with employee while employed.

Comments: (Please specify Pay Through date if different from Last Day Worked. For Non-Exempt employees, please specify hours to be paid)

## Approvals (See Delegation of Authority for approval levels)

Manager/Director/Group Director (Print & Sign): Rick Vandenberg    Date 6-13-06

Sr. Vice President/Executive Vice President (Print & Sign)    Date

Vice President/Group Vice President (Print & Sign)    Date

President / CEO & Chairman (Print & Sign)    Date

Human Resources (Print & Sign): Susan McBennett    Date 6/16/06

## HR Use Only

| BASIC LIFE PLAN (20) | VACATION PLAN (51) | IPP(50) / SPP(55) PLANS | ADJ SVC DATE (Rehires only) |
|---|---|---|---|
| [ ] Ineligible [x] Enroll [ ] Terminate | [ ] Ineligible [ ] Enroll [ ] Terminate [x] 2 Weeks [ ] 3 Weeks [ ] 4 Weeks | [ ] Ineligible [x] Enroll [ ] Terminate | |

Updated 3/01/2006

**Complete Form & Return to the Human Resources Department**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

**HARRY RUSSELL FRAZIER,**

               Plaintiff,

       — against —              **COMPLAINT**

**TIFFANY & CO.,** and **DAVID WILSON,**
individually,

             Defendants.

--------------------------------------------------------------- x

# COMPLAINT

From:     SACK & SACK, ESQS.
           Jonathan Sack, Esq.
           110 East 59th Street, 19th Floor
           New York, New York 10022-2050
           Tel:  (212) 702-9000
           Fax:  (212) 702-9702
           Attorneys for Plaintiff